## In re WILCOX.

### Ex parte ROUSS.

(District Court, D. Massachusetts. April 29, 1899.)

### No. 43.

1. BANKRUPTCY—PARTNERSHIPS—RULE OF DISTRIBUTION—JOINT AND SEPARATE CREDITORS.

Bankruptcy Act 1898, § 5, cl. f, prescribing the rule for the distribution of assets as between individual and firm creditors of bankrupt partners, applies not only to the case of the adjudication of the partnership as such, but also to the case where one member of the firm is adjudged bankrupt in his individual capacity.

2. SAME—NO JOINT ASSETS.

Where a member of a co-partnership is adjudged bankrupt in his individual capacity, creditors of the firm are not entitled to receive dividends out of his separate estate until his individual creditors have been paid in full; and this rule prevails notwithstanding the fact that there are no partnership assets.

In Bankruptcy. On review of ruling of referee

The certificate of the referee (Henry J. Field, referee in bankruptcy for Franklin county, Mass.) was as follows:

"The bankrupt, three or four years ago, was a member of a partnership at Lincoln, Nebraska. The other member of the firm left, with all the funds; and she set herself about to pay up the partnership debts, in which she succeeded so far as to pay all of them except the one in question, amounting to $1,000, besides accrued interest, which was presented for proof against her individual estate in bankruptcy, and allowed. Upon the question whether such creditor of a former partnership should share pro rata with the individual creditors, I ruled that as no evidence appeared showing that there are any assets of said partnership, and there was some evidence that there are none, under the law such creditor is entitled to share with the individual creditors; that is, pro rata."

The case was submitted to the judge without argument.

LOWELL, District Judge. The proper distribution of the joint estate of a bankrupt firm and of the separate estate of its component bankrupt partners has been the subject of much discussion in the courts of England and of this country for nearly 200 years, and the conclusions reached by the several courts, and by the same court at various times, have differed greatly. As was observed by Judge Ware in Re Marwick, 2 Ware, 229, 233, Fed. Cas. No. 9,181:

"The whole subject of marshaling the assets and claims between the joint and separate creditors in bankruptcy involves some of the most difficult problems that occur in the whole range of jurisprudence."

The historical development in England and in this country of the law upon this subject has often been stated imperfectly, and sometimes quite inaccurately, both in text-books and in reported opinions, and therefore it has seemed worth while to review with some degree of fullness that development from its beginning.

At common law the creditor of a partnership was the joint creditor of the partners. He might sue them, obtain judgment against them, and take out execution against them jointly, and satisfy the execution from any part of the estate of either or both, whether such estate were joint or separate. On the other hand, the separate creditor of one partner, having sued that partner, having obtained judgment against him, and having taken out execution thereupon, might satisfy the execution either from that partner's separate estate, or from his share of the joint estate. If, however, a partner's share of the joint estate was sold to satisfy a separate execution issued against him, the purchaser of the share found himself somewhat differently situated from the purchaser of an undivided share of property held jointly by persons not partners. The former was limited by a court of equity to take, not an undivided share of the joint partnership estate, but only the net amount due the debtor partner after the affairs of the partnership had been settled, and after all its debts had been paid. Hence the separate creditor of an individual partner found his claim upon his debtor's share of the partnership estate subordinated to the right of the remaining partners to apply the joint partnership estate in satisfaction of the claims of the partnership creditors. See Lindl. Partn. (6th Ed.) 308; Fox v. Hanbury, Cowp. 445.

Statutes of bankruptcy are of considerable antiquity in England, the first having been passed in the reign of Henry VIII. The bankrupt law of the present day descends from statutes passed in the

reigns of Elizabeth and of James I., which have been frequently amended from that time to this. Previous to the year 1822 these statutes contained but a single mention of bankrupt partners or partnerships, viz. that contained in St. 10 Anne, c. 15, § 3, which provided that the discharge of a bankrupt should not discharge a bankrupt partner or co-obligor. Before 1822, therefore, the rules regulating the distribution in bankruptcy of the joint and separate estates of partners were established altogether by judicial decision. An examination of the earliest records of the English courts of bankruptcy would be necessary to determine precisely how commissions of bankruptcy against members of a trading partnership were issued in the seventeenth century and in the first years of the eighteenth. It is pretty clear that a joint commission against all the partners was not unusual. In 2 Christ. Bankr. (2d Ed.) 33, it is stated that the first reported instance of a joint commission against two partners occurred in 1682. Nothing in the report suggests that the practice was then deemed extraordinary. In the case mentioned, the separate creditors of one partner alleged that the commissioners intended to divide the joint property among the joint creditors without permitting the separate creditors to share in the same, and they filed a bill to secure their own admission to come upon the joint fund. The assignees alleged that the partnership articles provided that joint debts should be paid out of joint assets, and that those assets should not be charged with the separate debts of the individual partners. Lord North decreed, in substance, that the joint assets should be applied to the payment of the joint debts, and that, if there was any surplus, it should be applied to the payment of the separate debts of the individual partners. If, however, the joint estate was insufficient, and the separate estates of the partners were drawn upon for payment of the joint debts, then, in that case, if either partner paid more than the other, he might be admitted to prove for such surplus against the separate estate of the other partner. It is not stated if the separate creditors of the several partners had, as against the separate estate of the several partners, a claim prior to that of the joint creditors; and it does not clearly appear whether Lord North's decision was rested by him upon the articles of partnership or upon the general law, though the latter is probable. Craven v. Knight, Goodinge, Bankr. 149; s. c. sub nom. Craven v. Widdows, 2 Cas. Ch. 139. It was thus established that, in case of a joint commission against all the partners, the joint creditors could avail themselves of the equitable right of the partners of a bankrupt to subordinate to the settlement of the partnership accounts the claims of his separate creditors upon his share of the joint estate. In 1693 a partner indebted to the partnership was made bankrupt under a separate commission, and the commissioners (for what reason does not plainly appear) assigned the partnership goods to the assignees in bankruptcy under that commission. The other partners brought a bill for an account, and urged that the assignees in bankruptcy took no more than the net share of the bankrupt after his debts had been paid. Of this opinion the court seemed to be, and the joint creditors were given priority in payment out of the joint estate. This, however,

was done, not in execution of the bankrupt law, but only after the interposition of a court of equity. The joint debts, though paid by the assignees, were proved before a master in chancery. Richardson v. Gooding, 2 Vern. 293. From this case it appears that, under a separate commission against one partner, joint creditors could enforce their prior claims upon the joint estate only by bill in equity, and not by petition in bankruptcy. See Gross v. Dusfresnay (1734) 2 Eq. Cas. Abr. 110. As has been said, it is impossible to determine what was the practice, at or about the year 1700, concerning the issuance of joint and separate commissions in cases where both partnership and partners were bankrupt, and where there were joint and separate assets and debts. In such cases, probably, both joint and separate commissions were issued and subsisted at the same time, the joint assignees acquiring the joint estate and paying the joint debts, and the separate assignees acquiring the separate estate and paying the separate debts; but the data are too imperfect to establish plainly that this course, or any other, was invariably pursued. See Ex parte Crowder (1715) 2 Vern. 706; In re Simpsons (1752) 1 Atk. 137.

In Ex parte Crowder a joint commission issued against A. and B., joint traders. Their separate creditors applied by a petition in bankruptcy (not by a bill in equity), that they might be let in under the joint commission to prove their debts against the separate estates of the respective bankrupts; alleging as a reason for this course, then apparently unusual, that the separate estates were of such small value that they would not bear the charge of taking out the two separate commissions which would otherwise be required. Lord Chancellor Harcourt ordered the petitioners to be let in to prove their separate debts upon their paying contribution to the charge of the joint commission, "and directed that, as the joint or partnership estate was, in the first place, to be applied to pay the joint or partnership debts, so, in like manner, the separate estate should be, in the first place, to pay all the separate debts; and, as separate creditors are not to be let in upon the joint estate until all the joint debts are first paid, so, likewise, the creditors to the partnership shall not come in for any deficiency of the joint estate upon the separate estate until the separate debts are first paid." Lord Harcourt's opinion is a very short one, and his reasons do not fully appear; but it seems clear that he did not suppose that he was laying down a new rule of substantive law, and it is probable that he was applying to the distribution of joint and separate estates under a single joint commission the rule which had formerly been applied when, at the same time, joint estates were administered under a joint commission and separate estates under a separate commission. It is to be observed that Lord Harcourt's rule, and the decisions which follow it, applied only to cases in which joint and separate estates were administered under a joint commission. Not uncommonly this has been overlooked. It should be noticed, also, that a petition and order were required in each case, though the order issued as of course. Ex parte Sandon (1743) 1 Atk. 68.

In Ex parte Cook, 2 P. Wms. 500, decided in 1728, a joint commission had been taken out against two bankrupt partners, under which the commissioners made an assignment both of the joint and of the

separate estate. Afterwards the separate creditors took out separate commissions; thus doing that which, in Ex parte Crowder, they had applied to be relieved from doing. In the conflict which thereupon arose between the assignees under the several commissions, Lord Chancellor King held that the assignment made under the joint commission passed the separate as well as the joint estate, and stated that:

"It is settled, and is a resolution of convenience, that the joint creditors shall be first paid out of the partnership or joint estate, and the separate creditors out of the separate estate of each partner; and if there be a surplus of the joint estate, besides what will pay the joint creditors, the same shall be applied to pay the separate creditors; and if there be, on the other hand, a surplus of the separate estate, beyond what will satisfy the separate creditors, it shall go to supply any deficiency that may remain as to the joint creditors."

This, it will be observed, is, in every detail, the rule laid down in Ex parte Crowder; and, though Lord King said he would not hinder the separate creditors from bringing a bill in equity for an account of the separate estate, evidently he did not consider this necessary, and eventually disposed of the whole matter in the court of bankruptcy. See, also, Howard v. Poole (1735) 2 Strange, 995; Wickes v. Strahan (1741) Id. 1157; Twiss v. Massey (1737) 1 Atk. 67.

The practice of taking out both joint and separate commissions was not definitely abandoned, however, and their co-existence continued to give much trouble to the courts. In Ex parte Yale (1721) 3 P. Wms. 24, note, it had been determined that a certificate under a separate commission discharged the bankrupt as well from his joint as from his separate debts. In Horsey's Case (1729) Id. 23, there were both joint and separate commissions, yet Lord King, on petition, let in the separate creditors, who had taken out the separate commissions (which were still subsisting), to prove their debts under the joint commission, in order to oppose the granting of a certificate thereunder. In 1752 Lord Hardwicke, in superseding a subsequent separate commission in favor of a prior joint commission, said that the practice of taking out both joint and separate commissions against the same persons, "being of late thought a very unreasonable one, as occasioning great confusion with regard to bankrupts' effects, has been discountenanced." In re Simpsons, 1 Atk. 137. For later cases, see Ex parte Hardcastle (1787) 1 Cox, Ch. 397; Ex parte Gillam (1789) 2 Cox, Ch. 193; Ex parte Poole (1790) Id. 227; Ex parte Brown (1793) 2 Ves. Jr. 67.

It remains to deal with the disposition of the joint estate and with the rights of joint creditors where no joint commission was taken out, but a separate commission or separate commissions alone existed. This state of things might arise from any one of several causes; e. g. the unreadiness of the joint creditors; their inability to procure the issuance of a joint commission because one partner was an infant or deceased, or because one partner, though insolvent, had not committed a statutory act of bankruptcy. See Wats. Partn. (2d Ed.) 293. In Ex parte Baudier (1742) 1 Atk. 98, joint creditors petitioned to be admitted to prove their joint debts under each of the separate commissions taken out against two partners; no joint commission hav-

ing been issued. Lord Chancellor Hardwicke held that, although separate creditors might, upon petition, prove their debts under a joint commission, yet joint creditors could not be admitted to prove their debts under separate commissions, but "must proceed in the common course, by taking out a joint commission." The opinion is short, and not altogether clear. The rule of Ex parte Crowder was formulated, and there was a recognition that where there were separate commissions the joint creditors had a right in equity (apparently not in bankruptcy) to be paid out of the surplus of the separate estates after the separate creditors had been satisfied. It seems probable that the case was rested upon a theory that the joint estate could not be properly administered under a separate commission. In Ex parte Voguel (1743) 1 Atk. 132, the assignees under a separate commission had in fact obtained possession of some of the joint estate, and the joint creditors brought a petition that they might have priority in its division. Lord Hardwicke refused to give complete relief under the petition filed in bankruptcy, but gave the petitioners leave to bring a bill in equity for the same purpose, and in the meantime (probably for the sake of convenience) let them in to prove their debts, without prejudice, under the separate commission. The disposition of the estate, joint or several, was not determined; but the joint creditors were assumed to have priority in the distribution of the joint estate, and the separate creditors in the distribution of the separate estate. Soon after the decision of Ex parte Voguel the court of common pleas decided that a separate commission might be taken out against one partner by a joint creditor. Crispe v. Perritt, Willes, 467. In delivering the elaborate opinion of the court, Lord Chief Justice Willes, after stating that no help in deciding the question was to be derived from the wording of any of the bankrupt acts, referred to two early cases (one under Lord Macclesfield, the other under Lord Talbot) in which separate commissions had been taken out by a joint creditor. Ex parte Caruthers, Cooke, Bankr. Law (8th Ed.) 26; Ex parte Upton, Id. 27. The lord chief justice concluded that the commission should issue as a matter of principle, and showed that in some cases great inconvenience would result if a joint creditor was not permitted to take out a separate commission. He expressly stated that the court did not determine at all in what manner the effects should be marshaled under the commission, saying that was "the proper business of the court of chancery." In Ex parte Crisp (1744) 1 Atk. 133, Lord Hardwicke expressly followed Crispe v. Perritt. See, also, the note to In re Simpsons, 1 Atk. 138. In Lord Hardwicke's time the practice seems to have been established as follows: If a joint commission was first taken out, separate commissions were ordinarily refused, and the distribution of both joint and separate estate was made under the joint commission according to the rule laid down in Ex parte Crowder. If no joint commission was taken out, a separate commission might issue on the petition either of a joint or of a separate creditor, and in such case joint creditors as well as separate were admitted to prove their debts. Sometimes, it seems, the order admitting joint creditors to prove specified that they should prove only to assent to or dissent from the certifi-

cate; but at other times, if matters took their regular course, and no further steps were taken, all creditors who had proved—both joint and separate—were satisfied ratably from all the estate which came into the hands of the assignees, both joint and separate. Usually, however, it was for the interest of one class of creditors or the other that the accounts of the joint and separate estates should be kept distinct, and an order for that purpose was obtainable by petition in bankruptcy presented either by the joint or by the separate creditors. The order to keep distinct accounts included, as matter of course, an order to apply the joint estate, in the first place, to the payment of the joint debts, and the separate estate, in the first place, to the payment of the separate debts. Green, Bankr. Law (5th Ed.; 1777) 150, note; Wats. Partn. (2d London Ed.; 1807) p. 324; Ex parte Hayward, Cooke, Bankr. Law (8th Ed.; 1745) 268; Ex parte Oldknow, Id. 259. The petitioning joint creditor seems to have been allowed, in recompense for the burden he had borne in obtaining the commission, to receive a dividend thereunder from the separate estate ratably with the separate creditors. No decisions touching this subject made by Lord Hardwicke's successors, Lords Northington, Camden, and Apsley, have been found. It appears from Cooke, Bankr. Law (1st Ed.; 1786) 5, 163, 165, that the practice of taking out a joint commission against all the partners, after separate commissions had issued against some of them, was then common; and furthermore it appears that the rights of joint creditors under a separate commission were not then clearly defined.

Lord Chancellor Thurlow seems to have been the first to lay down a different rule for dealing with the assets under a separate commission. In Ex parte Cobham (1784) 1 Brown, Ch. 576, where joint creditors petitioned to prove their debts under separate commissions against the partners, he said that:

"It would be hard that the joint creditors should come upon the separate estate, to the prejudice of the separate creditors, and still have an exclusive power of coming upon the joint estate; but the separate assignees might, if they pleased, possess themselves of the bankrupt's proportion of the partnership effects, and then he thought the justice of the case would be that both the joint and separate creditors should come in, pari passu, upon both funds."

As the petition was consented to, however, he made the order. In this case Lord Thurlow substantially followed the former practice, though, as reported, he seems not to have distinguished clearly between proving to deal with the certificate and proving to receive dividends. In Ex parte Hayden (1785) 1 Brown, Ch. 454, however, he changed his practice. The report is as follows:

"Upon a separate commission of bankrupt against one partner, the joint creditors petitioned, and were allowed to prove their debts, and to receive a dividend pari passu with the separate creditors, there being no joint estate. Ex relatione."

In the fuller report given in Cooke, Bankr. Law (8th Ed.) 261, the decision seems to have turned upon want of proof that there had been a partnership, and the absence of joint estate is barely mentioned. In Ex parte Hodgson (1785) 2 Brown, Ch. 5, it was sought to rescind the proof of a joint debt under a separate commission. Lord Thur-

low said that there was no distinction as to sole or separate debts, and "that debts, whether sole or joint, ought to be paid out of the bankrupt's estate, which is composed of his separate estate, and of his moiety of the joint estate, and therefore ordered that she [the joint creditor] should come in pari passu with separate creditors." In this case it seems that Lord Thurlow determined that, in the ordinary course of courts of bankruptcy under a separate commission, joint and separate creditors should share equally in the distribution of both joint and separate estates. See Ex parte Page (1786) 2 Brown, Ch. 119; Ex parte Flintum, Id. 120. These cases settled the practice. Lord Thurlow's reasoning is nowhere clearly expressed, but it was substantially as follows: If no joint commission be taken out, the assignees under the separate commission are entitled to an account of the business of the partnership, and to the bankrupt's share of the partnership estate after the joint debts have been paid. If they are unwilling to bring a bill to procure this account, then, as the debts of the partnership are at law the debts of each partner as well, and as it is admitted that joint creditors may petition for a separate commission, and, even though they do not, may yet, by order of the court of bankruptcy, be let in upon petition to prove their debts in order to allow or dissent from the granting of the certificate, it follows that they may also share equally with the separate creditors in the dividend, whencesoever that dividend is derived. But the difference between Lord Thurlow and Lord Hardwicke was one of form rather than of substance. Under Lord Hardwicke, the joint creditor under a separate commission shared equally with the separate creditors in the distribution of all the estate which came into the hands of the assignees, unless the order admitting him to prove limited him to dealing with the certificate, or unless an order was obtained upon petition for the keeping of distinct accounts. Under Lord Thurlow this order for distinct accounts could not be obtained upon petition in bankruptcy, except with the consent of the assignees. Ex parte Tate, 1 Cooke, Bankr. Law (3d Ed.) 307. Upon the filing of a bill in equity against the other partners for an account of the partnership business, however, the assignees under the separate commission were enjoined from paying a dividend to the joint creditors out of the separate estate. In other words, that which Lord Hardwicke had permitted in pursuance of proceedings in bankruptcy, Lord Thurlow permitted to be accomplished only by bill in equity. Lord Hardwicke thought that, upon petition for the keeping of distinct accounts, the separate estate might be reserved for the separate creditors. Lord Thurlow would reserve it only upon filing a bill in equity for an account of the partnership business. Wats. Bankr. (2d Ed.) 332; Ex parte Elton, 3 Ves. 239. Apparently, even the joint creditors were not, upon petition, permitted to obtain priority in the distribution of the joint estate which came into the hands of the assignees under a separate commission, but only upon their filing a bill in equity. Until this was filed they were paid ratably with the separate creditors out of the separate estate and the bankrupt's share of the joint estate. Hankey v. Garrat (1792) 3 Brown, Ch. 457; Id., 1 Ves. Jr.

236. It is further to be observed that, contrary to the statements of many text-books, the rule laid down in Ex parte Crowder for the distribution of assets under a joint commission was not in any way altered by Lord Thurlow. This he expressly decided in Ex parte Marlin (1785) 2 Brown, Ch. 15, and it appears by plain implication in Ex parte Bate (1785) 1 Brown, Ch. 452; Ex parte Clowes (1789) 2 Brown, Ch. 595; Ex parte Hardcastle (1787) 1 Cox, Ch. 397; Ex parte Seddon (1788) 2 Cox, Ch. 49; Ex parte Bentley (1790) Id. 218; Ex parte Lodge (1790) 1 Ves. Jr. 166. The same appears also from sundry forms found in 2 Cooke, Bankr. Law (3d Ed.) 140, 238. .

The law as it stood in 1793 is stated in the third edition of Cooke on Bankruptcy, which was published in that year, though an appendix, bound up with the only copy I have seen, was added in 1794. Under a joint commission, the joint estate was applied primarily to the payment of the joint debts, the separate estate to the payment of the separate debts; the separate creditors, upon payment of their share of charges, being let in under the joint commission by a special order made in each case, as of course, upon their petition. Under a separate commission joint creditors, by a similar special order (as to the special order, see Ex parte Copland, 1 Cox, Ch. 420), were admitted to prove and receive dividends ratably with the separate creditors out of such estate, both joint and separate, as came into the hands of the assignees under the commission. Where, however, the assignees under the separate commission took joint estate, the joint creditors admitted to prove their debts under the separate commission might apply, by petition in bankruptcy if the other partners consented, otherwise by bill in equity, to have an account taken of the partnership business. If that was done, the joint and separate estates were distributed as if the commission were joint. The right of the separate creditors under a separate commission to restrain the payment of dividends out of the separate estate to joint creditors was enforceable, as has been said, only in equity.

In 1793 Lord Loughborough, afterwards Lord Rosslyn, succeeded Lord Thurlow as chancellor, and on March 8, 1794, issued a general order, often mentioned, and commonly misunderstood. It may be found in 4 Brown, Ch. 548. Among other matters, it set out that special petitions in each case for leave to prove separate debts under a joint commission created delay and expense; and it therefore ordered that the commissioners under a joint commission should be at liberty to admit proof of separate debts under the same without special order, in which case the separate creditors so proving might vote on the question of assenting to or dissenting from the bankrupt's certificate. Separate accounts were to be kept, and the rule of distribution laid down in Ex parte Crowder was to be followed. The only change thus made by Lord Loughborough was to permit separate creditors to prove their debts under a joint commission without the special order formerly required in each case. The provision contained in Lord Loughborough's order concerning the distribution of the joint and separate estate introduced no change in the law whatsoever, and merely stated the practice which had always been followed under a

joint commission since Ex parte Crowder. The order in no way affected the practice under a separate commission. See 2 Christ. Bankr. Law (2d Ed.) 45.

In 1796 the case of Ex parte Elton came before Lord Loughborough. 3 Ves. 238. In that case a separate commission was taken out against one of two partners, and a joint creditor attempted to prove his debt thereunder for the purpose of receiving a dividend. The lord chancellor was evidently much perplexed, and his opinion, as reported, is not altogether clear. Following what was then the last edition of Cooke on Bankruptcy (the third), he stated that it had been understood for some time that a joint creditor might prove and receive a dividend in a case like that before him; but he noted the argument of counsel (Sir John Scott), "that if the assignees of the separate estate think fit, or will undertake, to file a bill [to wind up the partnership, and obtain for the joint creditors payment out of the partnership assets], in such case the joint creditor admitted to prove is to be restrained from receiving a dividend" (out of the separate estate). He observed upon the likeness between the application of each class of assets to the corresponding class of creditors, and the marshaling of assets, saying that the joint creditor had two funds upon which he could go, while the separate creditor had but one. Again, he pointed out that the joint creditor might proceed directly against the joint estate by a suit at law, while for every payment made out of the separate estate in discharge of the joint debt there must be suit in chancery by those representing the separate estate to be reimbursed from the joint estate:

"Wherever my order [i. e. to permit the joint creditors to prove for a dividend] will procure an account of the joint estate, there can be no harm [i. e. because, when an account of the joint estate is taken, the rights of the separate creditors against the separate estate are secured]; for then I should give the usual directions to apply the funds, respectively, the joint estate to the joint debts, the separate to the separate debts; the surplus of each to come in reciprocally to the creditors remaining upon the other. But, unless I can do this, every order I can make, to let a joint creditor receive a dividend from the separate estate, would carry a chancery suit in the bosom of it, to have the joint estate brought into the fund, to prevent the separate estate from being exhausted [i. e. if, from the nonassent of the solvent partner, or for other reason, an account of the partnership could not be obtained by order in bankruptcy, then, according to Hankey v. Garrat, a bill in equity would be necessary]; and I should make the order, and in the course of ten days suspend it by preventing him from receiving the dividend."

This quotation shows plainly that there had been no question of permitting the joint creditor to receive a dividend from the separate estate ratably with the separate creditor in any case where the joint and separate estate were both before the court, but only how to deal with the difficult and exceptional case of the rights of a joint creditor where only the separate estate was before the court under a separate commission. After much reflection and further argument, Lord Loughborough finally decided that a joint creditor might not prove to receive a dividend (thus restoring Lord Hardwicke's practice); and he observed that, if the joint creditors could receive a dividend in such case, there never would be a joint commission, but they would take out a separate commission against each partner. To this rule of ex-

·cluding joint creditors who had made proof under a separate commis-
·sion from receiving a dividend from the separate estate ratably with
the separate creditors, Lord Loughborough admitted, arguendo, two
·exceptions. The first was the case of the petitioning creditor. It
has been shown that a joint creditor might take out a separate com-
mission. Having done so, and thus having borne the brunt of the
suit, he was permitted to receive a dividend like a separate creditor.
"With regard to the creditor suing out the commission, the separate
creditors cannot object to his having the effect of the execution he
has taken out." This exception had, of course, no application to the
converse case under a joint commission. Again, and less clearly, in
arguing concerning the marshaling of assets, Lord Loughborough
said:

"It is not stated as a case where there are no joint effects. Here it is only
that there are two funds. Their proper fund is the joint estate, and they must
get as much as they can from that first."

Except Ex parte Hayden, before referred to, this is the first sug-
gestion of that exception to the rule concerning the distribution of
joint and separate estate which has caused so much debate and per-
plexity for a hundred years, and is in question in the case at bar.
Ex parte Elton was followed by Lord Loughborough in Ex parte Abell
(1799) 4 Ves. 837, although it seems that in that case there was no
joint estate.

The law as it stood at the very beginning of this century is well
stated in Cull. Bankr. Laws (London, 1800) p. 451. After observing
that the taking out of both joint and separate commissions against the
same persons had been discountenanced on grounds of expense, and
that such commissions could not subsist together, the author states
that the various classes of creditors, with some variations and re-
strictions, are let in under the same commission. Under a joint com-
mission the assignees take all the property, joint and separate. Un-
der a separate commission the assignees take all the separate prop-
erty, and take the bankrupt's interest in the joint estate in the same
manner as the separate creditor takes it upon an execution against
the individual partner. All creditors can prove under either a joint
·or a separate commission, in order to assent to or dissent from the
granting the certificate. As to dividends, separate creditors, formerly
by special order, but since 1794 by general order, may prove under the
joint commission, and may receive dividends from the separate es-
tate and from the surplus of the joint estate. Under a separate com-
mission, joint creditors cannot receive dividends from the separate
estate until the separate debts have been paid in full. An exception
to this rule is admitted in the case of a petitioning creditor, which
exception is explained, but no mention is made of any exception where
there is no joint estate. See, also, 1 Cooke, Bankr. Law (4th Ed.;
1797) 244. The latter author, writing between the decision in Ex
parte Elton and that in Ex parte Abell, seems to recognize both ex-
ceptions.

In 1801 Lord Eldon succeeded Lord Loughborough as chancellor.
In Ex parte Pinkerton, 6 Ves. 814, note, decided within a month of
his becoming chancellor, a joint creditor petitioned to prove and re-

ceive dividends under a separate commission against one of two persons, who were partners only upon the bill of exchange representing the debt which the petitioner sought to prove. There was no joint property. Lord Eldon admitted him to prove, reciting in the order that there was no joint property. He said that, "whatever he thought of a settled rule, he should adhere to it, on account of the mischief arising from shaking settled rules, but observed that it seemed very singular that the nature of the debt should turn upon the fact whether there is joint property or not." In this case the intimation somewhat hastily thrown out in Ex parte Elton, though disregarded in Ex parte Abell, was definitely formulated, and the exception to the rule of distribution in the case of absence of joint estate was established. It was recognized even more formally in Ex parte Hill (1802) 2 Bos. & P. (N. R.) 191, note.

In Ex parte Clay (1802) 6 Ves. 813, Lord Eldon followed Lord Loughborough's rule in Ex parte Elton, saying:

"The rule that prevailed in Lord Hardwicke's time, and down to the time of Lord Thurlow, was that joint creditors should not be admitted to prove under a separate commission for the purpose of receiving dividends with the separate creditors. Lord Thurlow altered that, upon much consideration, thinking the joint creditors ought to be admitted with the separate creditors, and left it so when he left this court. Lord Loughborough thought that was not right, and got back again, not quite to the old rule; but he settled it that they should prove only for the purpose of keeping separate accounts, but not to receive a dividend. I do not presume to say which is the best rule, except that the last is open to this difficulty: that the creditor is not a party to the proceedings under the commission. But I think it better to follow the rule that I find established, than to let it be continually changing so that no one can tell how it is. Therefore, unless some more prominent mischief can be pointed out, take the order according to Lord Loughborough's rule."

The reason for the exception to the general rule of distribution which was suggested by Lord Loughborough, and admitted by Lord Eldon, in the absence of joint estate, can be made out with reasonable probability. Lord Thurlow had, by order in bankruptcy, admitted the joint creditor to take a dividend ratably with the separate creditors under a separate commission; the dividend being paid from all the assets in the hands of the assignees, both joint and separate. If, however, the separate creditors under the separate commission would procure, by a bill in equity, the winding up of the partnership, and the application of the joint estate to the payment of the joint debts, then the chancellor, sitting in equity, would enjoin the assignees from paying a dividend to the joint creditors out of the separate estate until the separate creditors had been paid in full; thus depriving the joint creditors of the benefit of the order he has just made in bankruptcy. Lord Loughborough changed this practice, because of the inconvenience of making an order in bankruptcy for the payment of a dividend, and immediately thereafter suspending it upon a bill in equity. This change was made by Lord Loughborough in order to save bringing a bill in equity; but, where there was no joint estate, a bill in equity to take account of the partnership business would not lie, or, if barely maintainable, would be useless. Where, under Lord Thurlow, a bill in equity would have been impossible or useless, Lord Loughborough intimated an intention to refuse that order for keeping

distinct accounts which was his substitute for Lord Thurlow's bill in equity. Therefore, where there was no joint estate, there would be no order for keeping distinct accounts, and so the joint creditor would share ratably with the separate creditor in the dividend. Lord Loughborough's reasoning on this question in Ex parte Elton was defective, indeed, because it did not take sufficient account of the prior right inhering in the separate creditor to go upon the separate estate, but it was not unnatural. By his subsequent decision in Ex parte Abell, it seems that he became ready to disapprove the exception he had suggested.

Lord Eldon, when Sir John Scott, had been counsel for the joint creditor in Ex parte Elton and in Ex parte Abell, and he perceived in the changed practice inaugurated by Lord Loughborough an inconvenience which had escaped Lord Loughborough's attention. Under that practice the joint estate was to be distributed under a separate commission, and this, as Lord Eldon perceived, might not always be easy, inasmuch as the partner of the bankrupt was not a party to the commission. Lord Eldon, however, felt himself bound to follow Lord Loughborough's practice, by reason of the greater inconvenience which would arise from a change of practice with each changing chancellor. Viewing the difference between Lord Thurlow and Lord Loughborough as a difference about the boundary dividing equity from bankruptcy, rather than as a difference about the rights of creditors, he not unnaturally applied, somewhat blindly, what he understood to be the rule of Ex parte Elton, though his common sense warned him that the exception in the absence of joint estate, which Lord Loughborough had admitted arguendo, had little reason to support it.

In Gray v. Chiswell (1802) 9 Ves. 118, which was a bill in equity, and not a proceeding in bankruptcy, Lord Eldon gave the separate creditor priority upon the separate estate, observing that:

"It is extremely difficult to say upon what the rule in bankruptcy is founded. But, if the court aim at equality, it is extraordinary to say they shall have a better remedy in consequence of his death [i. e. in equity] than if he had lived [i. e. in bankruptcy]."

The distinction between the application of the general rule of distribution under a joint commission and under a separate commission was beginning to be obscured. In the frequent change of practice, in the confusion of equity and bankruptcy, in the anomalous rights of a petitioning joint creditor under a separate commission, and in discussion if a prior separate commission should be superseded in favor of a subsequent joint commission,—a discussion which need only be alluded to here,—the history of the general rule of distribution, of the causes which led to the rule's adoption, and of the origin of the exceptions to its application, was lost sight of. Lord Eldon's repeated grumblings, meant to be directed chiefly against the administration of the joint estate under a separate commission, were taken to be complaints against the general rule of distribution; and it came to be supposed, quite erroneously, that under Lord Thurlow the general rule of distribution had been changed. See the note to Bolton v. Puller, 1 Bos. & P. 548, written as early as 1805; Ex parte

Taitt (1809) 16 Ves. 193; Ex parte Machell (1813) 2 Ves. & B. 216; Ex parte Gardner (1812) 1 Ves. & B. 74. The earliest statement that Lord Loughborough's order of 1794 affected the distribution of estates is in Cooper, Bankr. Law (Phila., 1800) 298, 300. In that work the matter is misstated only partially.

The exception in the absence of joint estate, as the rule of Ex parte Pinkerton may be called, now came itself to receive fantastic constructions and to admit subexceptions. In Ex parte Peake (1814) 2 Rose, 54, the joint estate amounted only to £1. 11s. 6d., yet the joint creditors were not allowed to come upon the separate estate. In Ex parte Kennedy, 2 De Gex, M. & G. 228, the joint estate was exhausted in costs, yet it was held that the exception did not apply. In Ex parte Kensington (1808) 14 Ves. 447, there was a solvent partner, but no joint estate, and it was held that the separate estate should first be applied to the payment of the separate debts. Some curious learning arose as to the meaning of the words "solvent partner," and it was held that a partner who had applied to take the benefit of the insolvency acts, and had admitted £18,000 of debts and a total want of assets, was yet a solvent partner within the meaning of the subexception, because he had not been made a bankrupt. Ex parte Morris, Mont. 218. See, also, Ex parte Janson, Buck, 227. In Ex parte Willock (1816) 2 Rose, 392, the exception in the absence of joint estate was applied, as it seems, under a joint commission. Under such a commission the question would not often arise, for a joint commission would seldom be taken out where there was no joint estate. In Cowell v. Sikes (1827) 2 Russ. 191, the exception was first applied in equity.

Until 1822 the question had been unaffected by statute. In that year, by St. 3 Geo. IV. c. 81, § 10, it was provided that if a joint creditor or joint creditors of three or more persons, being partners, should be the petitioning creditor or creditors against two or more persons, being partners, all joint creditors might vote for assignees, and assent to or dissent from the certificate, but neither the petitioning creditor nor any other joint creditor should be permitted to receive a dividend out of the separate estate until the separate creditors had been fully paid. This, it will be noticed, expressly settled the rule where there were at least three partners, and the commission was issued against at least two of them on the petition of one or more of the joint creditors. Why the application of the law was made to be so limited does not clearly appear. See section 8 of the same act. By St. 5 Geo. IV. c. 98, § 104, it was provided that in all commissions against one or more of the partners of a firm, where the debt of the petitioning creditor was a joint debt, the petitioning creditor should receive no dividend out of the separate estate until all the separate creditors had been fully paid. This cut off the petitioning joint creditor from the separate estate in all cases, the joint creditors not on the petition having been cut off by the rule in Ex parte Elton. St. 5 Geo. IV. c. 98, practically was never in force, being repealed by an act passed the day after it took effect. 6 Geo. IV. c. 16. By section 62 of the last-mentioned act it was provided that, in all commissions against one or more partners, any joint creditor might prove his debt under the

94 F.—7

separate commission for the purpose only of voting in the choice of assignees, and of assenting to or dissenting from the bankrupt's certificate; "but such creditor shall not receive any dividend out of the separate estate of the bankrupt or bankrupts until all the separate creditors shall have received the full amount of their respective debts, unless such creditor shall be a petitioning creditor in a commission against one member of a firm." This statute, while re-establishing the right of the petitioning joint creditor to receive a dividend out of the separate estate equally with the separate creditors, would seem clearly to abolish the other exception to the general rule, that in the absence of joint estate, and to establish generally that under both joint and separate commissions and in all cases, the joint estate should be applied first to the payment of joint debts, and the separate estate first to the payment of separate debts, subject only to the exception of the petitioning joint creditor under a separate commission. Section 62 obviated, of course, the necessity of a special order in each case to permit joint creditors to prove under a separate commission to deal with the certificate. See 2 Christ. Bankr. Law (2d Ed.) 92. This view of the statute is taken in Cary on Partnership, published in 1827. The author states that the right of the joint creditor to prove against the separate estate is entirely set at rest by St. 6 Geo. IV. See the American reprint of this work, pages 265, 220. Other writers saw the matter less clearly, and lost sight of the history of the rule and of its exceptions, neglecting the difference between joint and separate commissions, and between bankruptcy and equity. Thus, in 1 Deac. Bankr. (1827) 646, it is stated without qualification that the rights of joint and separate creditors under both joint and separate commissions are settled by Lord Loughborough's order of 1794. This order is said to accord in a measure with the old rule, which, though acted upon by Lord Hardwicke, was abandoned by Lord Thurlow, and restored by Lord Loughborough. In very many subsequent cases and text-books this version of the history has been recounted until it has become traditional and unquestioned, though, as has been already shown, it is quite inaccurate. This I shall venture to call the "traditional version."

Under these circumstances it was not unnatural that the intent of the legislature in passing St. 6 Geo. IV. c. 16, should be strangely interpreted. In Ex parte Morris (1831) Mont. 218, it was said that section 62 applied only to partnerships subsisting at the time of the bankruptcy,—a distinction which, as was pointed out in the argument of the case, deprived the section of nearly all effect, and introduced a meaningless subexception to the already fantastic exception. In Ex parte Marston (1839) Mont. & C. 576, 585, 587, 589, Ex parte Morris was much questioned, and the judges seem to have upheld the exception in the absence of joint estate by deciding that section 62 was not intended to change the method of distribution, and that it left the exception in the absence of joint estate in full force as theretofore. This had the advantage of getting rid of the subexception introduced by Ex parte Morris (where the partnership was subsisting at the time of the bankruptcy), but it was an audacious disregard of plain statutory language. The practice of the courts of bankruptcy

was now somewhat as follows, there being in this respect no distinction between the proceedings under a joint and under a separate commission: The joint estate was first applied to the payment of the joint debts, the separate estate to the payment of the separate debts, the joint creditors having a right to come upon the surplus of the separate estate, and the separate creditors having a right to come upon the surplus of the joint estate. The material exceptions to this rule were: (1) In the case of the petitioning joint creditor under a separate commission, as provided by St. 6 Geo. IV. c. 16, § 62, and (2) where there was no joint estate, and no solvent partner; this exception being upheld in spite of St. 6 Geo. IV. c. 16.

The confusion created by the last-mentioned exception thus ingrafted upon the general rule is well illustrated by the opinions rendered by the lords justices in Lodge v. Prichard (1863) 1 De Gex, J. & S. 610. A separate commission of bankruptcy issued against a surviving partner. Out of the joint estate there was paid a dividend on the joint debts insufficient to satisfy them. A suit in chancery was then brought to administer the estate of the deceased partner, who was also insolvent. The joint creditors of the firm sought to share equally with the separate creditors of the deceased partner in the distribution of his separate estate. After stating the general rule of distribution, and remarking that it applied in equity as well as in bankruptcy, Lord Justice Turner somewhat doubtingly sought its reason in the peculiarities of the law of partnership and in the rights of the partners in the joint estate, saying that it was not for him to say, now that the rule had been so long established, whether it was correct or not. Counsel had argued that the case before him fell within the exception in the absence of joint estate, because there was no joint estate yet remaining to be administered. He observed:

"In this case there was joint estate, and this rule (i. e. the exception) can be applicable only if it can be made out that the joint creditors are entitled in bankruptcy, when the joint estate has been exhausted, to come upon the separate estate for so much of their debts as may not have been satisfied out of the joint estate. I do not think, however, that the rule in bankruptcy has ever been carried, or can be carried, to this length. If it was, I do not see how any dividend could be made upon the separate estate until the joint estate was wound up, as it would depend upon the produce of that estate whether the joint creditors would come in upon the separate estate; and besides, if this effect was given to the rule, the consequence would be, as above pointed out, that the joint creditors would have a double fund to resort to, when the separate creditors could resort to one fund only, which would hardly be conformable to the ordinary rule of making a just and equal distribution."

Lord Justice Knight Bruce observed briefly:

"My opinion on the point arising in the present case has fluctuated, but I have arrived at the same conclusion as the lord justice."

From this it appears that in 1863—nearly a century and a half after the rule of Ex parte Crowder had been adopted—the modifications and exceptions ingrafted thereupon had so altered its aspect that two very able English equity judges doubted if a joint creditor, after exhausting the joint estate, had not the right for the unpaid balance of his debt to come upon the separate estate pari passu with the separate creditors. If he had this right, clearly the general rule of dis-

tribution would be limited to a mere marshaling of the joint and separate estates.

Finally, in Re Budgett [1894] 2 Ch. 557, Mr. Justice Chitty said that he had listened to a very learned argument tracing the history of section 40 of the bankrupt act of 1883 from the time of Lord King, and especially from the well-known order of Lord Loughborough (an argument which doubtless repeated the erroneous traditional version of that history). He then said that, in substance, the section had the same intent as the order (a statement quite erroneous, for the order applied only to joint commissions, concerned procedure only, and did not effect the distribution of estates). He then observed that there were four well-known exceptions to the order (referring to Lindl. Partn. [6th Ed.] 749), or rather "four cases which did not fall within the order." After stating that St. 6 Geo. IV. was passed in 1830 (a curious slip), he concluded that the order had always been interpreted with reference to the exceptions, and that, when the act of 1883 was passed, "it seems reasonable and proper to infer, and to adopt the inference as correct, that the legislature, though now for the first time it put the substance of the order (of 1794) on the statute book, intended the law to stand, on the construction of the section, in the same way that it stood previously to the passing of the act." It is probable that the law of England, both in bankruptcy and in equity, is now pretty well settled in accordance with the opinion of Mr. Justice Chitty and the statements of Lindley on Partnership, but undeniably it is rested upon a theory of historical development altogether erroneous. See, also, In re Carpenter, 7 Morrell, Bankr. Cas. 270; Read v. Bailey, 3 App. Cas. 94, 102; Lacey v. Hill, 8 Ch. App. 441, 444.

The very numerous cases in the state courts which have dealt with the distribution of the joint estate of a partnership and of the separate estate of the component partners have not arisen in bankruptcy, but almost altogether in equity. The general rule of distribution followed by English courts of bankruptcy is said to have been adopted in South Carolina in 1797. Tunno v. Trezevant (1804) 2 Desaus. 264, 270. In Woddrop. v. Ward (1811) 3 Desaus. 203, the general rule, and not the exception of Ex parte Pinkerton, was applied, though there was no joint estate. See, also, Sniffer v. Sass (1828) 14 Rich. Law, 20, note. In later cases, however, the priority given by the general rule to the claim of the separate creditor upon the separate estate has been weakened into a mere marshaling of debts and assets. Wardlaw v. Gray's Heirs (1837) Dud. Eq. 85; Fleming v. Belk (1856) 9 Rich. Eq. 149; Gadsden v. Carson, Id. 252, 267; Wilson v. McConnell, Id. 510. The case of Kuhne v. Law (1866) 14 Rich. Law, 18, leaves the whole matter in doubt, and the opinion therein rehearses what has been called above the "traditional version" of history.

In Pennsylvania the question was first discussed in Bell v. Newman (1819) 5 Serg. & R. 78. Chief Justice Tilghman rehearsed the traditional version, and denied that the general rule produced equality. Guided by the statutes of Pennsylvania more than by the general principles of law, he held that, where there was joint and separate estate, the separate creditors should receive from the separate estate a payment equal to that received by the joint creditors from the

joint estate, and that the rest of the separate estate should be divided pro rata between both classes of creditors.  Mr. Justice Gibson, afterwards chief justice, dissented vigorously, and declared himself in favor of the general rule.  This, he said, was "founded in the most substantial justice," inasmuch as "the joint creditors have already an immense advantage over the separate creditors in being exclusively entitled to the partnership fund."  "This exclusive liability of the partnership estate to the joint creditors is founded on no equity peculiar to themselves, but results from the nature of the contract of partnership, which requires the joint debts to be paid before the equity can be settled between the partners, each being individually liable till all is paid.  Concede the present question to the joint creditors, and you give them, in effect, a monopoly of the insolvent's whole estate.  What merit do they possess that the separate creditors may not lay claim to?  In the usual course of transactions each class indiscriminately trusts to the whole estate, both joint and separate."  "If, then, the policy of trade requires that the joint fund shall be appropriated, in the first instance, to payment of the joint debts, justice, equity, and conscience on the other hand, without interfering with that policy, demand that the separate creditors should, at least, have the miserable advantage of the same priority as regards the separate estate."  The dissenting opinion of Mr. Justice Gibson is well worth study as a vigorous and independent discussion of the general principles of law upon which the rule depends.  After prolonged hesitation, Bell v. Newman was explicitly overruled, and the general rule of distribution was definitely established in Pennsylvania.  Black's Appeal, 44 Pa. St. 503; McCormick's Appeal, 55 Pa. St. 252.

In Maryland, the question first arose in McCulloh v. Dashiell's Adm'r, 1 Har. & G. 96, decided in 1827.  Mr. Justice Archer, in delivering the opinion of the court, gave a history of the general rule, which, though not altogether full nor absolutely accurate, is fuller and better than any other to be found in any American report or text-book.  He observed that it was difficult to say upon what the general rule and the exception in the absence of joint estate were founded, and he criticised especially the exception.  Both, he declared, were settled and established in both bankruptcy and equity.  This case has remained undoubted in the courts of Maryland.

In Murray v. Murray (1821) 5 Johns. Ch. 60, 72, Chancellor Kent gave the history of the general rule in England, not exactly in the traditional version, but imperfectly and inaccurately.  The decision went upon another point.  In Wilder v. Keeler (1832) 3 Paige, 167, Chancellor Walworth expounded and applied the general rule, rehearsing some part of the traditional history.  He said nothing expressly about the exception in the absence of joint estate, though he expressed his disapproval of the decision in Cowell v. Sykes, 2 Russ. 191, in which the exception was applied by Lord Eldon.  The general rule has been recognized in several later cases in the courts of New York, and in Bank v. Stewart, 4 Bradf. Sur. 254, the exception was expressly disapproved.

It is not necessary to discuss elaborately the history of the rule and of the exception in all those states of the Union whose courts have

dealt with the subject. The general rule has been followed or recognized in Mississippi (Oakey v. Rabb's Ex'rs, Freem. Ch. 546; Irby v. Graham, 46 Miss. 425, 430, 432); in Nebraska (Bowen v. Billings, 13 Neb. 439, 443, 14 N. W. 152); in Iowa (Hubbard v. Curtis, 8 Iowa, 1; Miller v. Clarke, 37 Iowa, 325); in Minnesota (Ives v. Mahoney, 73 N. W. 720); in Tennessee (Fowlkes v. Bowers' Heirs, 11 Lea, 144). In none of these states has there been found a case which deals with the exception in the absence of joint estate. Both the rule and the exception have been recognized in Alabama (Smith v. Mallory's Ex'r, 24 Ala. 628; Van Wagner v. Chapman's Adm'r, 29 Ala. 172; Evans v. Winston, 74 Ala. 349); in New Jersey (Davis v. Howell, 33 N. J. Eq. 72); in Illinois (Rainey v. Nance, 54 Ill. 29; Young v. Clapp, 147 Ill. 176, 32 N. E. 187, and 35 N. E. 372; Ladd v. Griswold, 4 Gilman, 25, 39); in Missouri (Level v. Farris, 24 Mo. App. 445; Hundley v. Farris, 103 Mo. 78, 15 S. W. 312); in Rhode Island (Colwell v. Bank, 16 R. I. 288, 290, 15 Atl. 80, and 17 Atl. 913; Pearce v. Cooke, 13 R. I. 184); in Wisconsin (Thayer v. Humphrey, 91 Wis. 276, 64 N. W. 1007); in Maine (Harris v. Peabody, 73 Me. 262). The exception has been somewhat doubtfully recognized in Georgia (Toombs v. Hill, 28 Ga. 371; Keese v. Coleman, 72 Ga. 658). The rule has been recognized, and the exception disapproved, in Indiana (Weyer v. Thornburgh, 15 Ind. 124; Warren v. Able, 91 Ind. 107; Warren v. Farmer, 100 Ind. 593), and in Massachusetts (Potters Works v. Minot, 10 Cush. 592). In New Hampshire the rule has been recognized, and the exception declared to be unreasonable, though it is established in bankruptcy. If there be no preference where there is no joint estate, it is said by the court that there should be no preference where there is no separate estate. Weaver v. Weaver, 46 N. H. 188, 192. In Ohio the rule was disapproved in principle, though admitted to be established in bankruptcy, in Grosvener v. Austin's Adm'rs, 6 Ohio, 104. In Rodgers v. Meranda, 7 Ohio St. 179, both the rule and the exception were approved. In Brock v. Bateman, 25 Ohio St. 609, where the joint estate was not sufficient to pay the costs, the exception was allowed to operate, and, in the confusion of mind caused by an attempt to reconcile the theory of the exception with the theory of the rule, the court declined to say what would happen where the partnership assets would yield to the joint creditors less than the separate assets would yield to the separate creditors. Plainly, the court was inclined to reduce the rule to a mere marshaling of assets. In Kentucky it appears to be established that the joint creditor may waive his right to proceed against the joint estate, and, if he does so, may share equally with the separate creditor in both joint and separate estate; otherwise, the separate creditor receives from the separate estate as large a dividend as the joint creditor has received from the joint estate, and thereafter joint and separate creditors are paid pro rata from the separate estate. Bank v. Keizer, 2 Duv. 169. The general rule has been disapproved in Vermont. The numerous exceptions ingrafted thereon, it is said, show that the rule rests on no satisfactory basis. Bardwell v. Perry, 19 Vt. 292. It has been disapproved in Connecticut (Camp v. Grant, 21 Conn. 41), and in Virginia (Pettyjohn v. Woodroof, 10 S. E. 715). In Kansas the matter seems to be left in some

doubt. Fullam v. Abrahams, 29 Kan. 725. The list above given is not supposed to be exhaustive, but it represents with some fullness the rule of distribution as administered in the courts of equity of the several states. It should be added that some of the decisions above cited rest upon the language of particular statutes, as well as upon general principles of law.

In Tucker v. Oxley (1809) 5 Cranch, 34, there was question concerning the right of the debtor of a bankrupt to set off against his debt to the bankrupt a debt due him from a firm of which the bankrupt was a member. The court permitted the set-off, and, in discussing the right of the joint creditor to prove against the separate estate of the bankrupt, Chief Justice Marshall made some statement of the history of the rule, not altogether full or accurate, but showing that he discriminated between bankruptcy and equity, and appreciated to some extent the reasons which determined the different practice adopted by Lords Thurlow and Loughborough. It is not necessary here to consider the decision in Tucker v. Oxley. The case is mentioned only for the reference made in the opinion of the court to the general rule of distribution. In Murrill v. Neill, 8 How. 414, the question came before the United States supreme court, not in bankruptcy, but in equity. The opinion of Mr. Justice Daniel states that "the rule in equity governing the administration of insolvent partnerships is one of familiar acceptation and practice." The learned justice then stated the history of the rule, partly in traditional version, but with some discrimination between equity and bankruptcy, though with little between separate and joint commissions. He noticed the two exceptions,—that of the petitioning creditor and that in the absence of joint estate,—which he termed "eccentric variations in the English practice"; and he further said of them, "They do not, for aught we have seen, appear to have been recognized by the courts in this country." He referred with approval to McCulloh v. Dashiell's Adm'r, and to Story, Partn. 376, and he mentioned Tucker v. Oxley.

To this history of the rule of distribution there should be added some short consideration of the principles upon which the rule is supposed to rest, and these can neither be found nor applied without difficulty. In several cases, and in the writings of many persons learned in the law, elaborate arguments have been made to show that the rule which gives the separate creditor a prior claim on the separate estate is unsound in principle, and works unfairly in not a few instances. Eden, Bankr. Law (2d Ed.) 169; 2 Christ. Bankr. (2d Ed.) 35; Evans' Letter to Sir S. Romilly (1810) p. 81; Story, Partn. § 376. Indeed, some of the arguments used in support of the rule rather make against it. Thus it has been said that the rule is based upon the theory that the joint creditor gives credit to the joint estate, and the separate creditor to the separate estate. The facts are often quite otherwise. A man lending money to a firm lends it upon the credit of the individual estates of the separate partners as well as upon that part of their property which is engaged in the firm business; and, on the other hand, the separate creditor of a partner—his butcher or tailor, for example—gives him credit quite as much upon the successful firm business in which he is supposed to be engaged as upon any

property in his separate ownership. It has been said that, inasmuch as the law has laid down the rule of distribution as above stated, creditors know the rule, and give credit accordingly; but this argument, if made in support of the reasonableness of the rule, is vicious by proceeding in a circle. It makes the creditor give credit to a fund because such is the law, and makes the fact that he has given credit to the fund a reason for the law. The rule has been defended upon the ground that it is, in substance, a marshaling of assets; but it goes much further than the marshaling of assets in equity, and the confusion into which this treatment of the rule—as merely a marshaling of assets—brings a court is shown by the opinions in Lodge v. Prichard and other cases. The rule does not carry out the mercantile theory of the partnership relation. Cory, Accts. (2d Ed.) 124.

The historical origin of the rule lies not improbably in an ancient practice of distributing the joint estate under a joint commission and the separate estate under a separate commission, each commission dealing with its corresponding creditors. The best theoretic defense of the rule is probably this: The operation of the law of partnership which gives to any separate partner or his assignee only his net share of the partnership assets—a rule manifestly founded in justice and convenience—usually insures to the joint creditors a priority in the application of the joint estate, and therefore this half of the rule has seldom been questioned. The priority given to the separate creditor in the application of the separate estate is a rough, but practical, offset to the inequality caused by the rule governing the application of the joint estate. See the dissenting opinion of Judge Gibson in Bell v. Newman, 5 Serg. & R. 78. Entirely apart from statute, however, two things are quite clear: First, that the general rule, with some variations, is established in the courts of this country and of England; and, second, that these variations, and particularly the exception in the absence of joint estate, have tended to discredit the rule, and to confuse its operations, rather than to obviate its difficulties.

Thus far the history of the development in this country of the rule of distribution has been considered apart from the bankrupt acts. The explicit provisions of these acts and their construction by the courts remain to be dealt with. The bankrupt act of 1800 (2 Stat. 19), contained no reference to the distribution of the assets of a partnership and its component partners, and, except Tucker v. Oxley, no decision made under that act has been found which bears upon the question. Act 1841, § 14 (5 Stat. 448), reads in part as follows:

"The assignees shall also keep separate accounts of the joint stock or property of the company, and of the separate estate of each member thereof; and, after deducting out of the whole amount received by such assignees the whole of the expenses and disbursements paid by them, and net proceeds of the joint stock shall be appropriated to pay the creditors of the company, and the net proceeds of the separate estate of each partner shall be appropriated to pay his separate creditors; and if there shall be any balance of the separate debts of any partner, after the payment of his separate debts, such balance shall be added to the joint stock, for the payment of the joint creditors; and, if there shall be any balance of the joint stock, after payment of the joint debts, such balance shall be divided and appropriated to and among the separate estates of the several partners, according to their respective rights

and interests therein, and as it would have been if the partnership had been dissolved without any bankruptcy; and the sum so appropriated to the separate estate of each partner shall be applied to the payment of his separate debts."

This provision, it will be seen, recognizes the general rule of distribution, and says nothing about any exception thereto. In Re Marwick (1845) 2 Ware, 229, Fed. Cas. No. 9,181, there was no joint fund except $10, paid by a separate creditor for a worthless asset in order to create a nominal joint estate, and so to prevent the joint creditors from coming upon the separate estate. Judge Ware said:

"It has hitherto been found impracticable to establish any general rule that will meet the equities of all the various cases that come up in practice; and the courts have been finally compelled, instead of subjecting the whole to a rigorous analysis, and extracting a system of rules which will carry out the principles of natural justice, to cut down the difficulties by establishing a general rule, which at first seems conformable to general equity, and then to limit and qualify it by a number of arbitrary exceptions, in order to meet the particular equities of particular cases. This system is admitted to be not entirely satisfactory. It has sometimes been departed from, and again restored, and is now adhered to, not because it is in all respects conformable to the principles either of positive law or of natural equity, but partly as a rule of convenience, as it has been sometimes called, and partly because no system has been hitherto presented as a substitute which is not found to be encountered by equal difficulties." 2 Ware, 233, Fed. Cas. No. 9,181.

After saying that the general rule is based upon the theory of credit given to the different estates, the learned judge continued:

"The general rule therefore has its foundation in natural equity, and it is established by the law. The law itself makes no exception. Now, admitting the case of there being no joint estate to be a casus omissus, not contemplated, and therefore not within the purview of the law, it certainly covers all cases where there is a joint fund, without inquiring into its origin. And it is a rule in the construction of statutes that, when the statute covers the whole case in all its circumstances, and makes no exceptions, none can be made by the court." 2 Ware, 235, Fed. Cas. No. 9,181.

It will be perceived that the learned judge approved the general rule, disapproved the exception on principle, doubtfully recognized it upon authority, and avoided its effect by permitting its flagrant evasion.

Act 1867, § 36 (Rev. St. § 5121), is, in all essentials, the same as section 14 of the act of 1841. In Re Downing (1870) Fed. Cas. No. 4,044, Judges Dillon and Krekel held that the provision for distribution made by the act of 1867 did not apply where the commission was separate. The decision was rested largely upon section 27 of the act of 1867 (Rev. St. § 5091), which provides that "all creditors whose debts are duly proved and allowed shall be entitled to share in the bankrupt's property and estate pro rata, without any priority or preference whatever" (with certain immaterial exceptions). In Re Knight (1871) 2 Biss. 518, Fed. Cas. No. 7,880, Judge Drummond seems to have followed In re Downing, though it is a little hard to say whether he meant to declare that, under a separate commission, joint creditors could come ratably with the separate creditors upon the separate estate, even where there was joint estate (as would be the case if Rev. St. § 5121, and the general rule had no application to a sep-

arate commission), or meant to let them come upon the separate estate only where there was no joint estate. See In re Goedde, 6 N. B. R. 295, Fed. Cas. No. 5,500.

In Re Pease, 13 N. B. R. 168, Fed. Cas. No. 10,881, Judge Nelson, of Minnesota, held that Rev. St. § 5121, was wholly inapplicable in the case of a separate commission, saying:

"We thus have a firm dissolved, no assets, and all the partners insolvent and in bankruptcy, without any voluntary or invitum proceedings being instituted to declare them bankrupt as a firm. Under such circumstances, in my opinion, the individual creditors of Pease have no prior rights to the creditors of the old firm of which he was a member. Their claims have been duly proved, and they are entitled to share pro rata with the other creditors. The equity rule in regard to the rights of firm and individual creditors does not apply, for the reason that no proceedings have been instituted against the partnership under section 5121 of the Revised Statutes."

In Re Lloyd (1884) 22 Fed. 88, Judge Atchison apparently agreed with In re Knight, though the decision went upon another question. See, also, U. S. v. Lewis, 13 N. B. R. 33, Fed. Cas. No. 15,595. These decisions are a return—apparently quite unconscious—to the bankruptcy practice of Lord Thurlow, and to his distinction between joint and separate commissions, but apparently without that remedial intervention of equity which, under Lord Thurlow, made the exception in bankruptcy practically inoperative.

In Re Jewett (1868) Fed. Cas. No. 7,304, Judge Drummond confirmed the decision of the register, which held that the exception in the absence of joint assets was applicable under the statute. In Re Slocum, Fed. Cas. Nos. 12,950, 12,951, Judge Wheeler, and, upon appeal, Judge Blatchford, held that the exception in the absence of joint estate was applicable under the statute of 1867; and this even where there were joint assets insufficient to pay the expense of realizing them. No reasons were given. In Re Litchfield, 5 Fed. 47, Judge Choate followed In re Slocum, and he expressly differed from In re Knight in holding that section 5121 applied to separate, as well as to joint, commissions. In Re Blumer, 12 Fed. 489, Judge Butler held that, where there were joint assets collected which might have been divided, though they were afterwards spent in the vain attempt to realize other assets, the exception did not apply. Judge McKennan concurred in the opinion. In Re Byrne (1868) 1 N. B. R. 464, Fed. Cas. No. 2,270, Judge McCandless affirmed the decision of a register which held that the exception in the absence of joint estate was not applicable under the act of 1867. In Re Johnson, 2 Low. 129, Fed. Cas. No. 7,369, Judge Lowell intimated in his opinion that the exception was not applicable, but that point was not involved in the decision. See In re McLean, 15 N. B. R. 333, 337, Fed. Cas. No. 8,879.

The act of 1898 differs materially from the acts of 1841 and 1867. Clauses a, b, c, d, and e of section 5 provide for the adjudication and administration of a bankrupt partnership. Clauses f, g, and h are as follows:

"(f) The net proceeds of the partnership property shall be appropriated to the payment of the partnership debts, and the net proceeds of the individual

estate of each partner to the payment of his individual debts. Should any surplus remain of the property of any partner after paying his individual debts, such surplus shall be added to the partnership assets and be applied to the payment of the partnership debts. Should any surplus of the partnership property remain after the paying the partnership debts, such surplus shall be added to the assets of the individual partners in the proportion of their respective interests in the partnership.

"(g) The court may permit the proof of the claim of the partnership estate against the individual estates, and vice versa, and may marshal the assets of the partnership estate and individual estates so as to prevent preferences and secure the equitable distribution of the property of the several estates.

"(h) In the event of one or more but not all of the members of a partnership being adjudged bankrupt, the partnership property shall not be administered in bankruptcy, unless by consent of the partner or partners not adjudged bankrupt; but such partner or partners not adjudged bankrupt shall settle the partnership business as expeditiously as its nature will permit, and account for the interest of the partner or partners adjudged bankrupt."

Following In re Knight, it may be urged that the provisions of section 5, cl. f, apply only where a joint commission has been taken out, and that they are, therefore, inapplicable to the case at bar. But, if this be the true construction, then, under any separate commission, whether there be joint estate or not, the joint creditor will be allowed to take dividends from the separate estate ratably with the separate creditors. If this be the law, joint creditors will commonly take out separate commissions, as was pointed out by Lord Loughborough in Ex parte Elton. Lord Thurlow's rule, viz. that of paying all creditors ratably under a separate commission, did not prove so satisfactory even when it was tempered by the equitable remedies which he administered, that it should be readopted without those remedies. I hold, therefore, that section 5, cl. f, of the bankrupt act applies the rule of distribution to separate as well as to joint commissions, either directly or by analogy. See In re Litchfield, 5 Fed. 47.

Considering the plain language of the bankrupt act, which recognizes no exceptions to the general rule, the history of the exception in the absence of joint estate, the discredit and misconception which that exception has brought upon the general rule both in England and this country, the fantastic subexceptions imposed upon the exception, and the language used by the supreme court in Murrill v. Neill, I think that I am justified in holding that the exception is inapplicable under the present bankrupt act. If the language and decisions of some wise and learned judges are thereby disregarded, yet it has been shown that most, if not all, of those judges acted under a misapprehension of the history of the law. It is further to be noticed that section 5, cl. g, has, by permitting the joint estate to prove against the separate estate and vice versa, resolved a doubt which arose under the English law, and has enabled a court in bankruptcy to secure generally the equitable distribution of the property of the several estates. Section 5, cl. h, provides expressly for the settlement of the partnership affairs where one partner has been adjudged a bankrupt under a separate commission by directing the remaining partners to settle the partnership business; that is to say, to pay the joint debts. This provision removes, at least in part, the difficulty pointed out by Lord Eldon in the application of the gen-

eral rule to a separate commission. The decision of the referee is reversed, and the petitioning creditor is not to receive a dividend until the separate debts have been paid in full.